Walter Mooney, Executor of the Estate of Barnett Faroll, Deceased, Plaintiff-Appellee, v. Underwriters at Lloyd's, London, not Incorporated, Defendant-Appellant.

### Gen. No. 49,261.

First District, First Division.

December 7, 1964.

Rehearing denied January 25, 1965.

Lord, Bissell & Brook, of Chicago (N. S. Board-man, F. L. Tozer and J. M. Smyser, of counsel), for appellant.

James A. Dooley, of Chicago, for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court.

Plaintiff, as executor of the estate of Barnett Faroll, deceased, recovered a verdict and judgment for $50,-000 against defendant, Underwriters at Lloyd's London, not incorporated, on a policy of accident insurance. Defendant appeals.

On August 21, 1952 defendant, through its agent, Bowes & Company, Inc.,* issued Faroll, the decedent, the policy of accident insurance which was subsequently renewed on August 23, 1953. By its terms the policy provided for $50,000 for accidental death; for total dismemberment and for permanent or temporary disablement with weekly payment benefits of $250 up to three years if caused by accidental, violent, external and visible means solely and independently of all other causes.

On December 1, 1953, while the policy was in effect, Faroll was struck by an automobile while crossing LaSalle Street in Chicago, as a result of which he sustained a traumatic subdural or intercranial hemorrhage, causing his death on January 4, 1954. A claim was made under the policy. Defendant's investigation revealed that at the time of Faroll's application he was allegedly suffering from a peptic ulcer, diabetes and cataracts. In September 1954 defendant

---

* Although Bowes & Company, Inc., was made party defendant, at the close of all the evidence and with plaintiff's acquiescence Bowes & Company was dismissed out.

239

wrote plaintiff denying liability and enclosing a check for the premiums Faroll had paid under the policy. The check was returned and the present action was instituted.

The application for insurance, upon which the policy was issued, dated August 20, 1952 was signed by Faroll and one Cochran Supplee, an insurance broker. In the application were included the following questions and answers:

8(a) Is your sight in any way impaired or have you ever suffered from any affection of the eyes?

(Answer) No.

9 Have you any physical defect or infirmity?

(Answer) No.

10 Are you now perfectly well and in sound health?

(Answer) Yes.

Immediately above Faroll's signature was the clause: "I do hereby agree that the falsity of any answer in the application . . . shall bar the right to recovery thereunder, if such answer is made with intent to deceive or materially affect either the acceptance of the risk or the hazard assumed by the Underwriters." Additionally, the fourth of six conditions in the policy read that any "fraud, misstatement, or concealment either in the statement or proposal made by or on behalf of the Insured prior to or when effecting the Insurance . . . shall render this Insurance of no force and effect and all claim thereunder shall be forfeited."

It is defendant's theory that the insured induced issuance of the instant policy through misrepresentations in the application which materially affected either the acceptance of the risk or the hazard assumed

240

by the company, thus causing the policy to be void in its inception; and that the evidence in this respect, being neither contradicted nor denied, presented no question of fact for submission to the jury. Defendant further contends that it was entitled to a directed verdict because the affirmative defense of material misrepresentation was proved and not denied by any evidence on plaintiff's behalf.

Plaintiff contends that "within the context of the questions posed by the application the jury could find that no material misrepresentations were made," and in the alternative, that the material misrepresentations were made by agents of the defendant and, therefore, defendant is estopped from asserting them as a bar to the present action.

Defendant charges that the insured's health was a vital factor in determining the acceptability of his application, and that by failing to truthfully respond to questions 8(a), 9, and 10 in the application, Faroll caused defendant to assume a risk it would not have otherwise undertaken. To sustain its affirmative defense of material misrepresentation defendant called Dr. Theodore Zeckman, an ophthalmologist, who testified as to Faroll's eye condition. Faroll had worn glasses for many years, and in May 1947 consulted Dr. Zeckman for a routine check of his glasses, and to determine the status of Bell's paralysis (a facial paralysis, very mild in degree) which he sustained six weeks prior. It had affected the right side of his face. At that time the doctor found that due to the presence of cataracts in both eyes, Faroll's vision in his right eye was 30% (20/70), and 10% (20/200) in his left eye; and that with glasses, vision in his right eye could be corrected to 20/50.

Faroll then saw the doctor periodically through 1951 during which time a gradual reduction or impairment in vision had taken place. The eye that had 20/50

vision with glasses gradually deteriorated and the eye with 10% vision began to have even less. Dr. Zeckman recommended an operation on the left eye for the removal of the cataract, which was performed on May 17, 1952. The doctor testified there was improvement in the left eye and that by August of that year (the time the instant policy was issued (Faroll had, through the use of special cataract glasses, regained 20/20 visual acuity in that eye, straight ahead, but that the glasses which allowed him normal sight in his left eye had the effect of fogging or blurring out the vision in his right eye so that it was less than 20/200; that without the special glasses vision in the operated eye would be less than 20/200. He considered the condition of Faroll's eyes from the time of the operation until the last time he saw him (in 1954) to be an impairment of the eyes.

Defendant called Dr. Harry Jackson, a personal friend and physician of Faroll who had known him since 1907. He testified that Faroll had a "very, very mild form" of diabetes which at first was controlled by cutting down on his intake of sugar and carbohydrates. These controls were initiated in May 1952 in conjunction with Faroll's eye operation when Dr. Jackson put him on a special diet. About a year after the diet controls were effected, Faroll's condition had worsened to the point where it became necessary for Dr. Jackson to give him a small dosage of insulin. He further testified that Faroll had an old peptic ulcer for which he was taking Sippy powder (an old treatment initiated by and named after a Dr. Sippy) and which removed excess acid from the stomach. While he did not know if it was necessary that Faroll continue taking the powder during the ten to twelve years prior to Faroll's death, he did not find any activity of the ulcer; that Faroll had not complained of any difficulties with respect to the ulcer for the past

25 years; and that his stool tests taken at the hospital at the time of the cataract operation indicated no ulcer symptoms. In general, Dr. Jackson stated that it was common for men over 70 to develop the kind of diabetes found in Faroll, and that his case was very mild, and would probably have little effect on his general health if he cut down on starches and sugar. He said that Faroll was in fairly good health for a man of his age prior to the accident that caused his death.

Dr. Clement G. Martin, medical director for Continental Casualty Company of Chicago was called by defendant as an expert witness. He outlined his responsibilities and background in insurance and medicine to qualify him to represent the thinking and experience of the insurance field with respect to acceptance of risks. In response to a hypothetical question which assumed the facts in evidence, namely, the issuance of accident insurance to a man aged 72 who, in an application for such insurance stated that he had mild diabetes controlled by diet; that he had a history of stomach ulcers; that three months before the application he had a cataract removed from his left eye; that he had a cataract on his right eye; that, corrected with glasses, the vision in his left eye was 20/20; that vision in his right eye with the cataract, when tested alone, was 20/70; that the cataract glasses prescribed which permitted 20/20 vision in the left eye blurred out the vision in his right eye, Dr. Martin stated that the industry in general would reject such an applicant. He further stated that diabetes, however mild, is of the utmost importance in determining whether to accept or reject a risk, since it has a profound effect on the slower and poorer ability of a person to restore himself after an injury, even a minor one, even if such diabetes was very mild. He said that from a medical point of view there

243

are cases of diabetes described as mild, but from an underwriting point of view diabetes is always bad.

Plaintiff called as witnesses several business and social acquaintances of Faroll. These testified to the type of work Faroll had done as a member of the Board of Trade up to the time of his death, which work required him to buy and sell commodities by the use of hand signals; that his activities were about the same as they had been in all the previous years; that he operated his own firm and traded his own accounts, and that they had never noticed anything unusual about his eyesight or the food he ate.

Plaintiff called Mrs. Frances Lundh under Section 60. She was an insurance underwriter for Bowes and had authority to bind certain risks in behalf of Lloyd's, but she testified such risks were strictly circumscribed. She received Faroll's application and, on the basis of the information contained therein, determined that she could accept the risk, and so caused the policy to issue. In her work as underwriter she found humans had difficulties after passing ages 60 to 65 and that as to persons over 70, "we would expect them to be in reasonably good health for a man of his age." She said that ulcers would be of significance in passing on an application such as Faroll's and that she would expect diabetes to be mentioned in response to questions 9 and 10. She would expect someone who wore glasses to provide an answer to question 8(a). Where an application disclosed ulcers, diabetes and cataracts, it would, as a matter of course, be declined since Bowes would have no authority to bind Lloyd's to such a risk. "(O)n an application for an accident policy . . . finding a statement of cataract or cataract operations would of itself be reason for declination, because it is a serious impairment of the eyes, specifically excluded under our binding authority."

■ In order to defeat liability upon the policy it was incumbent upon the defendant to prove its affirmative defense that Faroll made false statements at the time of the execution of the application and that these misrepresentations materially affected the acceptance of the risk or the hazard assumed. Insurance Code of 1937, Sections 154, 359(a). (Ill Rev Stats 1963, c 73, §§ 766, 971(a).) Campbell v. Prudential Ins. Co. of America, 15 Ill2d 308, 313, 155 NE2d 9 (1958).

■ Whether a false statement or misrepresentation is material depends upon whether reasonably careful and intelligent men would have regarded the facts stated as substantially increasing the chances of the happening of events insured against so as to cause a rejection of the application or the imposition of different conditions. Weinstein v. Metropolitan Life Ins. Co., 389 Ill 571, 60 NE2d 207 (1945).

■ ■ The testimony is undisputed that the application failed to disclose Faroll's true condition at the time of its execution. If questions 8(a), 9 and 10 were properly answered they would disclose facts that could materially affect the risk and hazard of the policy coverage. Defendant was entitled to this disclosure. That the insured did not die from the affliction with respect to which information was withheld does not affect the materiality of the misrepresentations. Weinstein v. Metropolitan Life Ins. Co., 389 Ill 571, 60 NE2d 207; Campbell v. Prudential Ins. Co. of America, 15 Ill2d 308, 155 NE2d 9.

Mrs. Lundh, the underwriter who made the decision to issue the policy on the basis of the application, stated that she would expect the diabetes to be mentioned in answers to questions 9 and 10. She further stated that she would expect someone wearing glasses to so disclose in answer to question 8(a) and although

she did not consider the wearing of glasses alone an impairment if the glasses would correct the eyes, a history of a diseased condition would be a pathological situation and there would be a request for a statement from an ophthalmologist before submitting the case to the underwriters. Where an application for such a policy disclosed ulcers, diabetes and cataracts, there was no authority to accept it. On an application for a policy that covers accidental death benefit, accidental dismembership benefit and accidental weekly indemnity for three years, finding a statement of cataract or cataract operation on the eyes would of itself be reason for declination "because it is a serious impairment of the eyes specifically excluded under our binding authority."

Dr. Martin, the medical director of Continental Casualty Company gave expert opinion that the insurance industry generally would reject for accident coverage a person of Faroll's age who suffered from the conditions Faroll had at the time of his application.

He said that certain kinds of cataracts appear only in a person having diabetes, and that diabetes has a profound effect on the slower and poorer ability of a person to restore himself after an injury.

The decisive issue presented is whether there is any evidence in the record which, when viewed in its aspect most favorable to the plaintiff, constitutes proof that the misrepresentations were not material.

There is no denial that Faroll had cataracts which seriously affected his sight and vision, and that he had a history of diabetes. Some question might be raised as to the proof of ulcers but the two former conditions would suffice to affect the risk or hazard of the policy. It was unequivocally established that the underwriter at Bowes could not bind defendant Lloyd's if the application reflected the true status of Faroll's health. Dr. Martin's uncontradicted testimony

indicated that the insurance industry would reject the application.

The condition of one's eyes seriously affects the risk of an accident. Diabetes affects the physical condition of a person so as to increase the hazard of an accident. It also increases the risk of the policy coverage because it frequently affects recovery and often, when accompanied by injury, causes the loss of limb and retards recovery. We do not believe that the materiality of the information in the instant case differs from such issue in a health policy. The risk in this policy covers not only death but loss of limb, sight, total permanent or temporary disablement and doctors' fees. Defendant was entitled to the true information at the time it passed upon the application in order to properly evaluate the risk. It had the right to reject the risk and refuse to accept the hazard or to propose other restrictions or conditions. From the entire record we hold that the defendant proved its affirmative defense as a matter of law.

Plaintiff, however, insists that defendant is estopped from asserting the misrepresentations because Supplee was acting as its agent. The only evidence relating to this issue was contained in Supplee's deposition read into the trial. It disclosed that he was a licensed broker in Illinois and New York, maintaining an office in the latter city. He visited Chicago occasionally occupying hotel accommodations. He was not employed by Bowes or Lloyd's. Though having had prior dealings with them he was associated with a general agent of the Aetna Life Insurance Company and had no right to bind Bowes or Lloyd's. He knew Faroll for eighteen years, and sold him prior accident insurance with another company.

Upon the expiration of the policy with United States Fidelity & Guaranty Company, he "took steps to procure other insurance for Mr. Faroll." He found that

247

Lloyd's was writing men over seventy. He endeavored to get it for him. He induced Faroll to take the policy. He had many dealings with Faroll and knew him personally. There was no suggestion that he ever held himself out to Faroll as anything other than a broker. Supplee testified in his deposition, "I went to Faroll with the idea of getting his authorization to obtain coverage, similar coverage, in Lloyd's for him." He received a quotation from Lloyd's and after several conversations with Faroll, "I believe I finally secured his signature in his office in the Rookery Building. . . . He (Faroll) signed the application at my behest at that office." Supplee had filled in the answers to the questions on the application on the basis of what he knew personally about Faroll since he saw and observed him several times a year. He also used as a basis the information in the application for the prior policy. He admitted that he carried with him a blank application and had filled in the answers to the best of his knowledge after Faroll had signed it, and that he could not recall whether the application had been filled out while he was in Faroll's office.

Supplee was specifically questioned as to the responses appearing on the application with respect to questions 8(a), 9 and 10. In each case he admitted supplying the answers without consulting Faroll. After the application was filled out he took it to Bowes in Chicago. "They are known as agents." The policy subsequently issued. He delivered the policy to Faroll who paid him the premium. The renewal he effected by taking the renewal binder to Faroll and again collecting the premium from the insured.

Plaintiff cites Moone v. Commercial Casualty Ins. Co., 350 Ill App 328, 112 NE2d 626 (1953) as determinative of his contention. In the Moone case the plaintiff, an attorney, was referred by the Chicago

Bar Association to the Insurance Company with respect to the policy. He phoned the Company's general agent in Chicago for information and was told someone would call on him. Shortly thereafter one Hughes called on him, saying he was from the Company. Plaintiff had not previously known Hughes. Plaintiff signed the application in blank. Hughes filled in the answers indicating that plaintiff only had suspected ulcer when, in fact, he had been previously hospitalized for stomach ulcers.

In holding that Hughes was the agent of the Company and, therefore, that it was estopped from defeating plaintiff's claim on the policy, the court said (p 335): "Whether Hughes was the agent of plaintiff or insurer, so as to charge one or the other with responsibility for the answers in the application, depends upon who first set him in motion, who could control his action, who is to pay him and whose interest was he there to protect. Mechem, Outlines of the Law of Agency, § 117 (3rd ed, 1923)." The court found that the only reasonable inference from the testimony was that the Company set Hughes in motion, and that his actions as broker were controlled, for he was compelled to place plaintiff's application with the Company; he received his commission from the Company, and in addition he was there to protect the Company. He was there at the direction of the Company and his interest in filling out the application as he did was to succeed in his mission. In the Moone case the court was further influenced by the fact that the application was made during an "open period" when applicants, otherwise unacceptable, were accepted. The court said (p 336): "In view of the 'open period' policy of the insurer, what Hughes did is diminished in importance so far as the acceptance of the risk is concerned."

249

The Moone case is neither analogous to the case at bar nor is it closely in point, as plaintiff argues. Defendant did not first set Supplee in motion. He was a licensed broker who had sold Faroll insurance of all types before and had procured the previous accident policy with United States Fidelity and Guaranty Company. When that policy expired because of insured's age, Supplee "went to Mr. Faroll with the idea of getting his authorization to obtain coverage, similar coverage, in Lloyd's for him. He finally authorized me to get that insurance in Lloyd's." The record indicates that Supplee knew Faroll socially for eighteen years and visited him often. There is no evidence that defendant controlled him or his actions. It did pay him a commission as a broker, but that is all. The testimony is devoid of any inference, let alone proof, that Supplee was there to protect defendant's interest. Plaintiff has failed to show that Supplee was agent for Lloyd's or that he was "held out" as such. The burden of proving agency was upon the plaintiff. He failed to do so as a matter of law. There are no facts in the instant case that would justify submitting this issue to the jury.

We are of the opinion that the defendant was entitled to a directed verdict for the reason that its affirmative defense of material misrepresentation was proved and not denied by any evidence, and because plaintiff failed to produce any evidence from which it could be reasonably inferred that Supplee was defendant's agent.

Defendant has raised other points of error as grounds for reversal but in view of our opinion herein expressed, those contentions need not be passed upon.

The trial court is reversed and judgment entered here for the defendant.

250

Reversed and judgment for defendant.

MURPHY, P. J., concurs.

BURMAN, J., dissenting:

I am of the opinion that on the record in this case the verdict of the jury and the judgment rendered on the verdict by the Circuit Court was correct and should be affirmed.

It is uncontradicted that Mr. Faroll, the insured, who was 72 years of age, was covered by an accident insurance policy issued by the defendant. It is uncontroverted that while the policy was in force and effect, Faroll was struck by a car while walking as a pedestrian and died shortly thereafter. It was the undisputed testimony of a coroner's physician who performed a post mortem, that the sole cause of death was a traumatic subdural or intercranial hemorrhage. Also the broker, Supplee, stated that he and not Faroll answered the questions and that he did so from his own observations of the insured. It appears that the defendant was one of only a few insurance companies to issue such a special risk policy to persons over 70 and that it charged greater premiums because of the greater risk involved. It is also uncontradicted that neither defendant nor its local agent, Bowes and Company, personally examined the insured before issuing such a special risk policy to this elderly man.

In order to avoid payment on the policy, the defendant must prove that the deceased insured made false statements or misrepresentations which materially affected the risk assumed by the company. Furthermore, section 154 of the Insurance Code provides, in part, that "no such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or ma-

terially affects either the acceptance of the risk or the hazard assumed by the company." (Ill Rev Stats 1953, c 73, § 766.)

I am of the opinion that the issues of intentional misrepresentation and of agency cannot be decided as a matter of law in this case, but that there is sufficient evidence in the record to require that these issues be submitted to the jury. Where evidence is conflicting or of such a character that different inferences can be drawn therefrom, the questions of fact raised thereby should be submitted to a jury. Marshall v. Metropolitan Life Ins. Co., 405 Ill 90, 90 NE 2d 194; Weinstein v. Metropolitan Life Ins. Co., 389 Ill 571, 60 NE2d 207; Firemen's Ins. Co. v. Horton, 170 Ill 258, 48 NE 955.

The evidence pertaining to the agency question is sufficient to support the inference that Supplee, the broker who sold this policy, was not acting as the insured's agent in filling in the application for insurance or in obtaining the policy. It does not appear that the insured contacted Supplee about obtaining new insurance, but rather the record indicates that it was Supplee who took the initiative. Supplee had accounts with Bowes and Company other than that of the insured and it appears that Supplee had done business with Bowes and Company for many years. Supplee was paid a commission by Bowes and Company for the sale to the insured and it was Supplee who collected the premium and delivered the policy. Whether Supplee, who filled in the insurance application after the insured signed it in blank and who subsequently obtained the policy, was the insured's agent was a matter of fact to be determined by the jury under all the evidence and the circumstances in the case.

Likewise there is evidence in the record from which one might reasonably draw the inference that, even

if Supplee was acting as agent for the insured, the answers to the questions on the application were not made with actual intent to deceive or materially affect either the acceptance of the risk or the hazard assumed by the company. Every witness who testified agreed that at the insured's advanced age of 72 all persons have developed some physical ailments. Especially considering that the risk insured against was not the insured's health, but the chance of accidental injury, the answers given here do not necessarily indicate intentional deception. Question No. 10 asked, in general terms, "Are you now perfectly well and in sound health?" The evidence reveals that the insured was an operator on the Board of Trade, buying and selling in the various grain pits and that he was active daily in this business to the day of the accident.

Question No. 9 asked, "Have you any physical defect or infirmity?" Question No. 8 asked: "Is your sight in any way impaired or have you suffered from any affection of the eyes?" The evidence most favorable to the plaintiff reveals that he was in good health for a man of 72. A personal physical examination by the defendant company would in all likelihood have been favorable to him. Dr. Harry Jackson, the insured's personal physician for over 25 years, testified that the insured had a longstanding ulcer, but that during the ten or twelve years before the insured's death, the doctor did not find any activity of that ulcer. He also testified that the insured "had a very mild form of diabetes." As Dr. Jackson testified "it is fairly common for a person above 70 to develop the kind of diabetes I found in this man."

The same is probably true about the question concerning impairment of sight and affection of the eyes. Dr. Theodore Zeckman, a physician and surgeon specializing in ophthalmology, testified that he had re-

moved a cataract from the insured's left eye in 1952. He testified that following the operation there was a gradual improvement in his vision until he had achieved normal, 20 over 20, vision in that eye with some restriction of lateral vision. Because of a special lens for the right eye, the vision in that eye was blurred. In addition the doctor testified that a cataract is not an unusual condition when a person reaches the age of the insured at the time he took out the policy.

Whether the insured did make any material representations which would void his policy is, in my opinion, a question of fact to be determined by a jury from the evidence.